Washington Institute of Technology, Inc. v. Commissioner.
Washington Inst. of Tech. v. Commissioner
Docket No. 23794.
United States Tax Court
1951 Tax Ct. Memo LEXIS 365; 10 T.C.M. (CCH) 17; T.C.M. (RIA) 51001; January 9, 1951
*365 Robert A. Littleton, Esq., for the petitioner. George J. LeBlanc, Esq., for the respondent. JOHNSON Memorandum Findings of Fact and Opinion JOHNSON, Judge: Respondent has determined a deficiency in petitioner's excess profits tax liability in the amount of $51,322.97 for the fiscal year ended May 31, 1943. Of the adjustments made by respondent the only adjustment in issue in this proceeding is the disallowance of a deduction for bad debts in the amount of $28,127.25. Findings of Fact Petitioner is a corporation organized June 2, 1933, under the laws of the State of Maryland with its principal place of business located at Washington, D.C. It was organized for the purpose of engaging in electronic research for the United States Navy. All of its stock is owned by Colonel Sidney F. Mashbir. Petitioner filed its income and declared value excess-profits tax return for the fiscal year ended May 31, 1943, with the collector of internal revenue for the district of Maryland. Colonel Mashbir resigned from the United States Army in 1923 and thereafter was engaged in various pursuits. In 1928 he established his own business and became the Washington representative of *366 Toledo Scale Company and was so engaged until 1936. While so employed he invented a method of proportioning concrete aggregate by weight. This process was patented by Toledo Scale Company. Exclusive licenses under the patents were assigned to Colonel Mashbir. The method or process is used by ready-mix concrete plants or on large construction projects. The scale equipment used in connection with such method is not sold to the user but is installed on a rental basis, the rent paid therefor being a portion of the amount saved through the use of the process. On December 1, 1936, the Toledo Scale Company and Colonel Mashbir entered into an agreement whereby the latter acquired the right to purchase or lease exclusively, for the concrete industry, scales equipped with the attachments used for the aforementioned purposes. The agreement also provided inter alia that Colonel Mashbir might assign same to a corporation controlled and actively managed by him. On January 28, 1937, Colonel Mashbir organized a corporation known as Scientific Concrete Service Corporation, (hereinafter referred to as the Concrete Corporation), to take over the business contemplated in the aforementioned agreement *367 with Toledo Scale Company. The authorized capital stock of the Concrete Corporation consisted of 500 shares Class A (voting) stock and 500 shares of Class B (nonvoting) stock, the total par value of which amounted to $100,000. All of the authorized capital stock was issued to Colonel Mashbir solely for the contract with the Toledo Scale Company. The Concrete Corporation began operations during the year 1938. No working capital having been provided the corporation by its sole stockholder, Sidney F. Mashbir, its operations were financed from the start thereof in 1938, and until about April 1942, by the petitioner. This method of financing was preferred over public or bank financing for the reason that Mashbir wanted to retain control of the Concrete Corporation. Between the date of commencement of operations by the Concrete Corporation and May 31, 1943, the net amount of the funds received by that corporation from the petitioner was $45,751.51. However, the debit balance shown on the books of petitioner as of May 31, 1943, was only the amount of $28,127.25 and the composition thereof may be summarized as follows: Fiscal
Year
Advances
Receipts
ended
and
and
May 31
Charges
Credits
Balance
1940
$13,112.48
$ 1,986.45
$11,126.03
1941
10,537.82
6,400.10
15,263.75
1942
15,444.35
2,644.96
28,063.14
1943
64.71
.60
28,127.25
Totals
$39,159.36
$11,032.11
*368 Operating losses in the amounts of $8,795.65, $6,841.63, $9,740.14 and $16,298.06 were sustained during the years 1938, 1939, 1941 and 1943, respectively, while profits of $1,470.71 and $8,097.57 were realized during the years 1940 and 1942, respectively. In 1939 the manager of Concrete Corporation was removed and its operations were more or less in abeyance with the exception of rental contracts then in force. This situation continued until in January, 1941, when Robert F. Moss took over the management of the corporation. At this time there were three rental contracts in force. Colonel Mashbir realized this process was revoluntionary and that development of the corporation and repayment of the advances would require a long period of time, but he did not doubt the eventual success of the venture. Funds continued to be advanced by petitioner until about May, 1942. In early part of 1942 a contract which petitioner had with another company concerning the payment of royalties to petitioner was repudiated and this source of revenue was lost. Requiring additional funds, petitioner obtained a bank loan in September, 1942, the terms of which restricted the use of the funds for a *369 specific purpose and none other. Petitioner believed this prevented it from making further loans to the Concrete Corporation. At the beginning of 1943 the Concrete Corporation was indebted to the Toledo Scale Company to the extent of $29,004.74, of which about $20,000 was past due. Early in that year the Toledo Scale Company began pressing for payment of this past-due amount and was giving consideration to taking over the business or cancelling its contract with the Concrete Corporation. In order to avoid either possibility, additional financing was necessary. Several attempts to obtain bank loans were unsuccessful. Petitioner was not in a position to help. Therefore, because of the confidence of Robert F. Moss in the business of Concrete Corporation, he, by letter dated April 23, 1943, proposed to Sidney F. Mashbir, then serving outside the country as a colonel in the United States Army, that if the latter would give him a one-half interests in the company, and at the same time arrange matters so that the amounts furnished by petitioner to the Concrete Corporation before he, Moss, took over the management thereof would be repayable only out of earnings or as a last claim in case *370 of liquidation, he, Moss, would obtain a loan which he would guarantee or secure with personally owned collateral. Colonel Mashbir agreed thereto in a cablegram dated May 28, 1943, and such an agreement was executed on June 30, 1943. By the terms of that agreement the amount of $45,751.51 due the petitioner was subordinated to a loan of $35,000 which Rober F. Moss agreed to secure, and did secure, for the benefit of the Concrete Corporation. At this time Concrete Corporation had outstanding debts of $28,127.25 owing the petitioner in addition to the indebtedness of $17,642.87 incurred for the period 1937 to May 31, 1939, which amount had been charged off by petitioner and allowed as a bad debt deduction by the respondent in his determination of petitioner's liability for income tax for the fiscal year ended May 31, 1939; $29,004.74 owing Toledo Scale Company, $20,000 of which was past due. Concrete Corporation at this time had as a major part of its capital assets, fixtures and equipment under rental, the depreciated value of which was $47,047.65. On May 6, 1943, petitioner charged off as a bad debt on its books the total sum of the advances made to Concrete Corporation since June 1, 1939, of *371 $28,127.25. The debt in this amount became worthless within the fiscal year ended May 31, 1943, and was taken as a bad debt deduction on petitioner's income and declared value excess-profits tax return for that period. Opinion The issue of whether or not a deduction for a bad debt is allowable under section 23 (k) (1) [1], Internal Revenue Code, and section 29.23 (k)-1 [2], of Regulations 111, necessarily involves, in this case, two questions: (1) Was the advance a loan resulting in a debt, and (2) did the debt become worthless within the taxable year? *372 We do not agree with respondent's contention that the advances here involved were in the nature of gifts because they were worthless when made. The Scientific Concrete Service Corporation was a new corporation formed for the purpose of developing a market for a revolutionary but proved process. It was constantly gaining wider recognition and new contracts were being made. During the four-year period in which the balance due on the open account accumulated, receipts and credits to the account in the amount of nearly one-third of the total advances had been made. During the six years of its operation this corporation realized profits in two years. The eventual success of this corporation and repayment of the loans to petitioner were not doubted by Colonel Mashbir, the president and sole stockholder of petitioner, nor Moss, the manager of Concrete Corporation. Upon these facts we are unable to hold that the advances of petitioner were worthless when made and were in the nature of a gift, and do hold that they were bona fide loans made with the expectation of return. To continue to make loans to a corporation already heavily indebted may reflect upon the wisdom of the loans, but, upon *373 the circumstances before us, does not determine their worthlessness when made. Robert H. Montgomery, 37 B.T.A. 232. We think W. F. Young, Inc. v. Commissioner, 120 Fed. (2d) 159, cited by respondent, not applicable. The loans there in question were made for personal reasons and with the confirmed belief that they would never be repaid, hence, they were worthless when made. The record does not substantiate respondent's contention that these advances were contributions to capital and not loans. The debtor and petitioner were separate and distinct corporations, each organized to carry on a specific unrelated business. Petitioner received no stock nor evidence of ownership in the debtor corporation in return for the advances. The advances were intended as loans as evidenced by the book entries recording the advances and the repayments. Respondent's contention that petitioner's advances would have benefited only Colonel Mashbir and that these advances were in the nature of indirect dividends disregards the doctrine of corporate entity and is contrary to the accepted treatment of dividends. These advances were not regarded as dividends on petitioner's books, *374 no declaration of dividends was made, nor were the advances made to a stockholder. We have no evidence before us that Colonel Mashbir regarded the advances as dividends in any accounting of his personal finances. We accordingly hold that the advances made by petitioner were loans and not dividends. Tri-State Realty Co., 12 T.C. 192; affd. (C.A., 5th Cir., 1950), 180 Fed. (2d) 593. In order that a debt be deductible as a worthless debt it must have become worthless within the taxable year. Section 23 (k) (1), supra. Worthlessness is not determined by an inflexible formula or slide rule calculation, but upon the exercise of sound business judgment. "The taxing act does not require the taxpayer to be an incorrigible optimist". United States v. S. S. White Dental Mfg. Co. of Pennsylvania, 274 U.S. 398. As was stated in Raffold Process Corp. v. Commissioner (C.A., 1st Cir., 1946), 153 Fed. (2d) 168, 171: "* * * To warrant a deduction for a bad debt it requires only that the taxpayer establish that during the year for which the deduction *375 is sought a situation developed as a result of which it became evident in the exercise of sound, objective business judgment that there remained no practical, but only a vaguely theoretical prospect that the debt would ever be paid. * * *" [Citing Deeds v. Commissioner, 47 Fed. (2d) 695; Farmer v. Commissioner, 126 Fed. (2d) 542.]
The situation relied on by petitioner in its determination that the debt became worthless within the taxable year arose from a combination of circumstances. Toledo Scale Company, in the early part of 1943, began pressing for payment of the overdue debt of $20,000 and threatening cancellation of its contract. Concrete Corporation, having no funds with which to pay the debt, made attempts to obtain loans from banks. These were unsuccessful. The only source of funds available to Concrete Corporation to enable it to remain in existence was the loan proposed by Moss, which was accepted. By the terms of this loan agreement, payment of petitioner's loan was subordinated to the $35,000 loan obtained and guaranteed by Moss, who also obtained a one-half interest in Concrete Corporation. During this same period a decline in the business *376 was becoming perceptible in that existing contracts were being terminated and the possibility of new contracts was remote. These facts, we believe, constitute sufficient basis, in the use of business judgment, to determine the debt owed petitioner to have become worthless within the fiscal year ended May 31, 1943. The fact that the loan agreement with Moss was not signed until June 30, 1943, is of little concern in as much as the transaction had been completed prior to May 31, 1943, except for the formal signing of the agreement. We accordingly hold that the bad debt deduction taken by petitioner is allowable. Decision will be entered under Rule 50. Footnotes
1. SEC. 23. DEDUCTIONS FROM GROSS INCOME. In computing net income there shall be allowed as deductions: * * *
(k) Bad Debts. - (1) General Rule. - Debts which become worthless within the taxable year, * * *. ↩
2. SEC. 29.23 (k)-1. Bad Debts. - (a) Bad debts may be treated in either of two ways - (1) By a deduction from income in respect of debts which become worthless in whole or in part, * * *. * * *
(b) * * * If a debt becomes wholly worthless during the taxable year, the amount thereof which has not been allowed as a deduction for any prior taxable year shall be allowed as a deduction for the taxable year. There should accompany the return a statement of facts substantiating any deduction claimed for bad debts. * * * In determining whether a debt is worthless in whole or in part the Commissioner will consider all pertinent evidence, including the value of the collateral, if any, securing the debt and the financial condition of the debtor. * * * Where the surrounding circumstances indicate that a debt is worthless and uncollectible and that legal action to enforce payment would in all probability not result in the satisfaction of execution on a judgment, a showing of these facts will be sufficient evidence of the worthlessness of the debt for the purpose of deduction. * * *↩