The Home Agency Company v. Commissioner.
Home Agency Co. v. Commissioner
Docket No. 4105-64.
United States Tax Court
T.C. Memo 1966-48; 1966 Tax Ct. Memo LEXIS 234; 25 T.C.M. (CCH) 272; T.C.M. (RIA) 66048; March 9, 1966
*234 Held: (1) That the first note of a former employee, K, evidencing indebtedness to petitioner, had value at the beginning of 1961, but became worthless in 1961. (2) That a second note of the same employee had value on January 1, 1961, but did not become worthless in 1961 because J had a legal liability as the co-maker thereof, and petitioner failed to prove that its claim against J had no value in 1961. (3) That the loss in 1961 from the worthless note and indebtedness of K was $32,514.50, which is deductible in 1961 under section 166(a)(1), 1954 Code. (4) That petitioner sustained a net operating loss in 1961 for which it is entitled to loss deductions in other years under section 172. James C. Herndon, 680 East Market St., Akron, Ohio, for the petitioner. Alan E. Cobb, for the respondent. HARRON Memorandum Findings of Fact and Opinion HARRON, Judge: The respondent determined deficiencies in income tax for the years 1959-1962, inclusive, as follows: Income Tax
Year
Deficiency
1959
$1,375.31
1960
44.33
1961
1,174.07
1962
1,544.46
The issue is whether indebtedness of a former employee became worthless in 1961, and what the amount of the loss was, if any, for the purpose of a claimed bad debt deduction under section 166(a)(1), *236 1954 Code. Petitioner also claims loss deductions in other years under section 172 for alleged net operating loss in 1961. Findings of Fact The petitioner, an Ohio corporation, organized in 1919, is engaged in a general insurance agency business in Akron, Ohio. It filed its returns for the taxable years with the district director of internal revenue at Cleveland, Ohio. The returns were filed on the basis of a calendar year under an accrual method of accounting. M. Kathryn Larkey, hereinafter called Kathryn, the daughter of the founder of petitioner, was first employed by petitioner in 1930, and was continuously employed thereafter until 1961. She was when first employed, a policy writer; later, bookkeeper, secretary, salesman; and eventually she held the offices of secretary, treasurer, and president of petitioner. She became the president in 1953 and held that office until April 1960. She was the majority stockholder. She had a license from the State of Ohio to sell insurance. She married Jack Larkey in 1935. They were divorced in 1953. Jack was employed by petitioner in 1935, as an insurance solicitor. Upon the death of Kathryn's father in 1942, Jack became the president *237 of petitioner. Jack left petitioner in 1950 to operate a small manufacturing business in West Virginia. In 1960, there were 404 shares of capital stock in petitioner outstanding, of which Kathryn owned 203 shares, the majority, and others owned the balance. She was the majority stockholder from 1953 to April 29, 1960. For several years, beginning in 1953, Kathryn made cash withdrawals out of petitioner's funds which were entered on the books in an account receivable, in Kathryn's name, which was a running account. She made repayments as well as withdrawals. At the end of 1954 she owed petitioner $3,302.78. The net amount of her withdrawals in the years 1955 through 1959 were $995.59 in 1955, $1,606.30 in 1956, $10,808.06 in 1957, $10,668.53 in 1958, and $6,377.27 in 1959. At the end of 1959 she owed petitioner $33,758.53. During the first 3 months of 1960, she withdrew $3,173.34, repaid $2,388.37, and her net withdrawals were $784.97. On March 31, 1960, she owed petitioner, according to the running account, $34,543.50. In the early part of 1960, petitioner owed a substantial amount to insurance companies which threatened foreclosure on petitioner's accounts with them. In that *238 event, petitioner's insurance agency business would have ended. Jack learned of petitioner's financial difficulties, and he determined that Kathryn's excessive withdrawals of petitioner's funds had precipitated the financial problem and caused petitioner's inability to make timely payments of its obligations to the insurance companies. Jack requested C. I. Poulsen, the chief executive officer of Aid Investment & Discount, Inc., in Akron, to review petitioner's problem and to develop a plan for the refinancing of petitioner. Poulsen engaged certified public accountants in Akron to determine the true financial condition of petitioner as of April 30, 1960. Thereafter, he agreed to form a syndicate to refinance petitioner. The accountants determined that petitioner owed the insurance companies at least $47,990.23. All of the liabilities of petitioner were ascertained, and only the assets having definite values were reflected on the financial statement furnished by the accountants. Poulsen knew that petitioner's right to gross insurance commissions had value, as well as the renewals based on the gross commissions received. Poulsen knew about Kathryn's extensive experience as an officer *239 of and insurance salesman for petitioner, and that she had successfully operated petitioner's business for a number of years and was generally acquainted with the insurance business. Kathryn, in 1960, was the only employee of petitioner who was licensed by Ohio to sell insurance. Jack did not have a license to sell insurance and could not obtain one for several months. Poulsen developed a plan for refinancing petitioner and changing the management. He proposed that Jack should become the general manager of petitioner, and Jack became the general manager. Poulsen also proposed that Kathryn should resign from the office of president but continue as an employee; that she would not be allowed to withdraw or borrow funds from the petitioner; that strict employment contracts would be drawn up for Kathryn and Jack, respectively; that all of the outstanding stock of petitioner would be acquired by a syndicate; and that Jack would be given an option to acquire 40 percent of petitioner's stock, if he succeeded in successfully managing the finances of petitioner, with the assistance and cooperation of Kathryn. Poulsen advised Kathryn that she would be required to pay her indebtedness to petitioner; *240 to execute a promissory note, payable in installments; and to sell her 203 shares of stock in petitioner to the syndicate, the proceeds to be paid to petitioner and applied in the reduction of her note. Jack and Kathryn agreed to the several conditions required by Poulsen. Aid could not make any loan to petitioner, but some associates of Poulsen agreed to form a partnership for the purpose of refinancing petitioner. On April 29, 1960, a partnership, Ace Investors Co., was organized. The members are Poulsen, Louis Lombardi, James C. Herndon, and Lewis Seikel. On April 29, 1960, an agreement was entered into between the partners, the petitioner corporation, and Kathryn. Under this agreement Ace acquired the 404 shares of outstanding stock of petitioner, including Kathryn's shares; Ace and petitioner agreed that petitioner would employ Jack and Kathryn; Jack and Kathryn, respectively, entered into separate agreements with petitioner; and Ace agreed to give financial assistance to petitioner. As of March 31, 1960, the net deficit of petitioner amounted to $34,625.62. In the balance sheet there was not included among the assets the account receivable from Kathryn. Petitioner owed insurance *241 companies $47,990.23 on March 31, 1960. Kathryn executed a non-interest promissory note to petitioner dated April 29, 1960, in the amount of $34,543.50, the then balance due petitioner according to the running account. The note provided that the principal amount would be paid in annual installments of $4,320, on July 1, 1961, and July 1 of each succeeding year; that if any installment, or part, should not be paid when due, 8 percent interest would be charged upon the unpaid installment until paid; and the principal amount of the note and accrued interest would become due upon default in the payment of all or part of an installment for 60 days after the due date. Ace purchased all of the shares of stock of petitioner. Kathryn received $2,040 for her 203 shares on May 4, 1960, which was paid to petitioner and applied on the first installment of her note, reducing the installment to $2,280 leaving a balance due on the note of $32,503.50. Under the agreement of April 29, 1960, Ace paid $36,924.61 to insurance companies on petitioner's obligations; and petitioner gave its 6 percent promissory note to Ace on May 1, 1960, in the amount of $39,983.16, payable in monthly installments *242 starting on June 10, 1960. On April 29, 1960, petitioner and Kathryn executed an agreement (made part of the agreement with Ace) under which petitioner agreed to employ Kathryn; Kathryn agreed to the terms of employment and, also, not to compete with petitioner, and not to engage in the insurance agency business within Summit County during the period of the agreement and for 2 years after the termination thereof. Petitioner agreed to employ Kathryn for 3 years, beginning May 1, 1960, at a salary of $500 per month. Kathryn agreed to assist the officers and the general manager of petitioner "in advancing and expanding the insurance agency business of the Corporation [petitioner] where her technical knowledge, experience, reputation or personal contacts or associates will be helpful * * * in furthering and advancing the insurance agency business of the Corporation." Also, it was agreed that if Kathryn faithfully performed her obligations under the agreement, petitioner had the option, with the approval of the board of directors, to pay Kathryn "as a bonus" any part or all of her note, in installments or otherwise. Petitioner reserved the right to terminate the employment agreement, *243 and to notify Kathryn of such action, with the approval of the directors, if Kathryn's services should be inadequate and not in accordance with the best interests of the operation of petitioner's business. Kathryn was employed by petitioner under the agreement. She resigned as president. The total amount of salary paid her in 1960 was $7,700. In 1959, her salary was $9,600. Poulsen, Ace, and petitioner entered into the employment agreement with Kathryn because it was necessary to continue to employ her in order to continue the operation of petitioner's business. She had built up petitioner's business and was well and favorably known in the insurance business in the area; she had written a large part of the insurance business on petitioner's books; she had many clients; and she was the only employee who had an Ohio license to write insurance. All concerned believed that the continued employment of Kathryn was essential, and that if she did not continue as an employee the business of petitioner could not be continued. Also, it was their intention, if Kathryn's services were satisfactory, to pay bonuses for her services, in addition to her salary, and to apply the bonuses in payment *244 of her note. On April 29, 1960, Kathryn's assets, including her shares of stock in petitioner, exceeded her liabilities by a small amount. In addition, she had intangible assets consisting of her license to write insurance, her contacts with clients, good will represented by insurance contracts she had written in the past that were on the books of petitioner, and the agreement of employment by petitioner under which she could earn bonuses to be applied to her debt to petitioner. Early in 1961, the auditors ascertained that in 1960, after April 29, Kathryn had incurred additional, unauthorized indebtedness to petitioner in the net amount of $3,511. Entries were made in the running account which increased the net amount of Kathryn's debt to $36,014.50. Poulsen, at the time, regarded Jack as negligent in failing to be alert and not discovering Kathryn's unauthorized additional withdrawals. Kathryn was required to execute a second promissory note to petitioner in the amount of $3,500. Jack was required to execute the note as a co-maker because he had been charged with the duty of preventing, if possible, any further withdrawals by Kathryn. When Jack executed the note, petitioner *245 knew that he was an accommodation co-maker of the note. This note was dated December 31, 1960, although executed in 1961. It was due in 12 months at 6 percent interest. The note was entered in petitioner's books as an account receivable. The debt of Kathryn to petitioner for all withdrawals, including those made in 1960, consisted of $11; plus the balance due on the first note of $32,503.50; plus $3,500, the amount of the second note. Because of the additional, unauthorized withdrawals in 1960, discovered in March 1961, petitioner terminated the employment of Kathryn as of March 17, 1961. Under the agreement not to compete, she could not write insurance in Summit County and therefore could not be employed there. She moved to Cleveland where she was employed by an insurance agency at a reduced and nominal salary. She did not have business contacts in Cleveland and was not known there. She had to start the insurance business there anew. She did not pay the balance of the installment on her first note which was due on July 1, 1961, and she did not make any payment on the second note. The amount of her debt to petitioner continued to be $36,014.50 during 1961. Petitioner was unable to *246 collect anything from her on her debt in 1961 and thereafter; petitioner has never been able to obtain from Kathryn any further payment on her entire debt. Poulsen, petitioner, and Louis Seikel, petitioner's attorney, investigated Kathryn's financial condition and learned of her job and small earnings in Cleveland. Seikel and Poulsen ascertained that Kathryn did not have any credit and could not pay all or any part of the total amount she owed petitioner. Petitioner charged off in 1961 as worthless and uncollectible all of Kathryn's debt, on the advice of its attorney, Seikel. Respondent disallowed a deduction of a bad debt loss taken on petitioner's return for 1961 in the amount of $36,014.50, which resulted in the elimination of the net operating loss of $31,594.15 reported in the return for 1961. In its amended petition, petitioner has made claims for loss deductions for 1959, 1960, and 1962 of net operating loss carrybacks and carryover of the claimed net operating loss in 1961; and petitioner has filed claims for refunds. Ultimate Findings 1. Kathryn was indebted to petitioner at the end of 1960 in the total sum of $36,014.50. This indebtedness was not worthless in 1960 *247 or on January 1, 1961, and the two notes representing the indebtedness had intrinsic value on January 1, 1961, and were not then worthless. With respect to Kathryn, her indebtedness in the above amount became worthless in 1961. 2. Jack Larkey was liable as an accommodation co-maker of the note for $3,500. Petitioner failed to prove that this note could not be collected from Jack under his liability as a co-maker. 3. Petitioner sustained a loss in 1961 from a worthless debt in the net amount of $32,514.50. Opinion The questions are as follows: (1) Whether the note of Kathryn in the amount of $34,543.50, dated April 29, 1960, had an intrinsic value in 1960 and on January 1, 1961, when the balance due was $32,503.50. (2) Whether her note for $3,500 had any intrinsic value in 1960 and on January 1, 1961. (3) Whether the indebtedness of Kathryn in the amount of $32,503.50, and the note therefor, became worthless in 1961. (4) Whether the note for $3,500 became worthless in 1961 with respect to both Jack and Kathryn, and whether there was a liability for the note in Jack. The main issue arises under section 166(a)(1), 1954 Code. Under all of the questions, petitioner had the burden *248 of proof. An alternative claim is made by petitioner, on brief, for a loss in 1961 from embezzlement under section 165(a). However, the petition, as amended, does not present a question of loss from embezzlement and under this Court's rule that issues not raised by the pleadings will not be considered, no consideration is given to a claimed loss from embezzlement. J. William Frentz, 44 T.C. 485, 491; Irving Segall, 30 T.C. 734. The questions presented are questions of fact, except with respect to Jack's liability as a co-maker of and accommodation party to the note for $3,500, which is a question of law; and if he was liable, the fact question is whether the note became worthless in 1961 with respect to Jack's liability. Those questions are considered separately. Upon consideration of the entire record, we are satisfied and find that in 1960 Kathryn was indebted to petitioner under a running account receivable in the total net account of $36,014.50; that the debt and the notes evidencing the debt had intrinsic value in 1960, at the end of 1960 and beginning of 1961; and that with respect to Kathryn, the entire indebtedness became worthless in 1961 when *249 her employment by petitioner ended. However, petitioner failed to prove that $3,500 was not collectible from Jack under his liability. Therefore, the allowable loss deduction is limited to $32,514.50. Kathryn acknowledged that she was indebted to petitioner for the full amount of her withdrawals and executed 2 notes therefor. She promised to make restitution and in 1960 paid $2,040 on her debt. She was a valuable employee who had been primarily instrumental in carrying on petitioner's business profitably for many years until her diversions of funds to her own use became large. On the basis of her demonstrated ability as an insurance salesman, her contacts, general experience, and assurances, petitioner was reasonably justified in deciding in 1960 that under the management and supervision of Jack, a former employee, Kathryn would earn bonuses (which petitioner intended providing) with which to make restitution and pay her notes. The obligation undertaken by Kathryn in 1960 gave petitioner a basis for a reasonable conclusion that it would obtain reimbursement. The facts affirmatively shown by the record in this case indicate that during 1960 and the early part of 1961 petitioner reasonably *250 could have expected reimbursement. Kathryn continued to be an employee and her promise to make repayment was a contract obligation which accrued in 1960. Accordingly, it is concluded that Kathryn's debt was not worthless at the beginning of 1961 or after April 29, 1960. Cf. Douglas County Light & Water Co. v. Commissioner, 43 F. 2d 904 (C.A. 9); George M. Still, Inc., 19 T.C. 1072, 1076, affd. 218 F. 2d 639 (C.A. 2). See, also, Farish & Co. v. Commissioner, 31 F. 2d 79; Ledger Co. v. United States, 37 F. 2d 775. There remains the question whether in 1961, Kathryn's first note having a balance of $32,503.50, and her further indebtedness of $3,500, evidenced by her second note, plus $11, a total of $36,014.50 became worthless in 1961. Whether or not a debt has become worthless is a question of fact which depends primarily upon the reasonable probability of its ultimate collection. Section 166(a) provides that "There shall be allowed as a deduction any debt which becomes worthless within the taxable year." Generally, there must be an identifiable event in the year in which the loss deduction is claimed, which determines *251 the worthlessness of the debt. But there is no standard or all-inclusive test for determining worthlessness, and worthlessness is not determined by an inflexible formula but upon the exercise of sound business judgment. See 5 Mertens, Law of Federal Income Taxation, Sec. 30.28. In Minneapolis, St. Paul & Sault Ste. Marie Railroad Co. v. United States, 164 Ct. Cl. 226, - F. 2d - (January 24, 1964), the following observation is made: It is obvious that there is no precise test for determining worthlessness within the taxable year and neither the statutory enactment, its regulations, nor the decisions attempt such an all-inclusive definition. From the numerous decisions, we are taught that a determination of whether or not a debt becomes worthless in a particular year must be confined to the facts of the particular case. Furthermore, it is often impossible to select a single factor or "identifiable event" which clearly establishes the time at which a debt becomes worthless and thus deductible. More often it is a series of events which in the aggregate present a picture establishing that the debt in question has become worthless. Such a decision of necessity requires a practical *252 approach, not a legal test. Boehm v. Commissioner, supra. It must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court might draw from a particular fact in another case are not binding on the examining court, although the same fact may be present. The Tax Court has aptly said that "worthlessness is not determined by an inflexible formula or slide rule calculation, but upon the exercise of sound business judgment." Washington Institute of Technology, Inc., 10 T.C.M. 17, 20 (1951). In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the "incorrigible optimist" and the Charybdian character of the "stygian pessimist." United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403 (1927); Ruppert v. United States, 86 Ct. Cl. 396, 403, 22 F. Supp. 428, 431, cert. denied 305 U.S. 630 (1938). To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. *253 Montgomery v. United States, 87 Ct. Cl. 218, 228 (1938), 23 F. Supp. 130, 135, cert. denied 307 U.S. 632 (1939); Curry v. Commissioner, supra. The taxpayer is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence. There were several circumstances occurring in 1961 which established that Kathryn's indebtedness became worthless in that year. In March 1961, auditors found that she had made additional unauthorized withdrawals in 1960, after April 29. Because of them, petitioner discharged Kathryn as of March 17, 1961. Since she had agreed not to write insurance in Summit County for 2 years after termination of her employment by petitioner, she could not obtain a job in the area where she was known and had business contacts, and she was obliged to go to Cleveland to seek employment in an area where she was unknown and did not have clients or business associations. She obtained employment in Cleveland at a reduced and nominal salary, as petitioner's investigation in 1961 showed. Poulsen and petitioner's attorney found *254 in 1961 through investigation that no amount could be collected from Kathryn and concluded that her notes and debt had become worthless, insofar as Kathryn was concerned. Her assets had been exhausted and her earning ability had been severely curtailed. We are satisfied from all of the evidence and circumstances that after petitioner terminated Kathryn's employment in 1961, her notes and indebtedness became worthless. Any further efforts to collect upon the debt from Kathryn would have availed petitioner of nothing. Petitioner, Poulsen, and Seikel diligently investigated Kathryn's financial circumstances. A taxpayer is not required to be an incorrigible optimist. It is concluded that the debt became worthless in 1961, except with respect to Jack's liability under the note for $3,500, and that petitioner's loss in 1961 was $32,514.50. Cf. United States v. S. S. White Dental Mfg. Co., 274 U.S. 398. With respect to the note for $3,500, petitioner has failed to establish that Jack was not liable as a co-maker and that collection thereof could not be made from him. He continued to be and still is employed by petitioner as vice-president and manager. In 1960, petitioner paid *255 Jack a bonus of $4,500. Although Jack had his own financial problem in 1961, petitioner has not established that all or part of $3,500 could not have been collected from him under a plan of collection. In The City Trust & Savings Bank v. Schwartz, 68 Ohio App. 80; 39 N.E. 2d 548 (1940), the court stated the rule in Ohio to be that under section 8134 of the General Code a person who signs a note as an accommodation maker "is liable on the instrument to a holder for value, notwithstanding the holder at the time of taking it knew him to be only an accommodation party", and even though the accommodation party did not receive any value himself. Petitioner was a holder for value of the note. It is held that petitioner, for failure of proof and under the above-cited rule, is not entitled to a deduction for $3,500 in 1961, part of the total deduction claimed. Since petitioner is entitled to a deduction in 1961, for a worthless debt, in the amount of $32,514.50, it sustained a net operating loss in 1961 and is entitled to loss deductions in other years for the net operating loss under section 172, which will be computed by the parties under Rule 50. Decision will *256 be entered under Rule 50.