## C. DEAN JOHNSON and ANN C. JOHNSON *v.* DEPARTMENT OF REVENUE

Joe D. Kershner, Strowger & Kershner, Portland, represented plaintiffs.

Ted E. Barbera, Assistant Attorney General, Salem, represented defendant.

Decision for defendant rendered March 28, 1975.

CARLISLE B. ROBERTS, Judge.

The plaintiffs have appealed from defendant's Order No. I-73-51, dated September 12, 1973, assessing a deficiency on account of personal income taxes for the tax year 1969. (The 1969 income tax return was signed by husband and wife but references hereinafter to "plaintiff" refer to plaintiff-husband.)

Following an administrative hearing, the defendant found that a deduction taken on the 1969 return was properly classified as a nonbusiness bad debt on account of moneys owed by Eagle Flightways, Inc., Hillsboro, Oregon, to the plaintiff. The opinion of the defendant stated:

"A nonbusiness bad debt must be wholly worthless within the taxable year, before its deduction may be allowed. The evidence shows that the debts were partially secured by the real and personal property of Eagle Flightways, Inc., and cannot, therefore, be considered totally worthless during the 1969 tax year.

"The payments made by the petitioner as guarantor would not be deductible in 1969, because the evidence showed that the payments were not made until 1970 and 1971. The petitioner is a cash basis taxpayer, and the proper time for a cash basis taxpayer to take a deduction is the year in which he makes payment. See, Annot. 23 ALR 2d 431 (1952)."

The sole question before the court is whether the nonbusiness bad debt of $109,000 deducted by plaintiff on the personal income tax return for 1969 had some value as of January 1, 1969, but was totally worthless as of December 31, 1969, as plaintiff contends. (The tax treatment of plaintiff's losses as a

stockholder and as a guarantor are not disputed by the parties.)

Pursuant to the Personal Income Tax Act of 1969, ORS 316.012 and 316.032, the applicable law is Int Rev Code of 1954, § 166(d), providing a deduction for a nonbusiness debt which "becomes worthless within the taxable year, * * *."

The federal statute has often been construed. A good summary of the applicable rules is to be found in *Minneapolis, St. Paul & Sault Ste. Marie R.R. Co. v. United States,* 164 Ct Cl 226, 64-1 USTC ¶ 9213, 13 AFTR2d 472, 478-479 (1964). It points out that subjective tests were rejected by the U. S. Supreme Court in *Boehm v. Commissioner,* 326 US 287, 292, 66 S Ct 120, 90 L Ed 78, 166 ALR 708, 34 AFTR 10 (1945), because the statutory language requires that the loss, to be deductible, "must have been sustained *in fact* during the taxable year." (Emphasis by the Supreme Court.)

"* * * We interpret this as meaning that the taxpayer now not only has the burden of proving that the debt had some intrinsic value at the begining of the year it allegedly became worthless and that it became worthless in the taxable year in question, but also that the taxpayer must show that throughout the entire life of the debt, the evidence reasonably available to him pointed out that it was possessed of some value and had not become wholly worthless [until some time in the year of deduction]. [Citations omitted.]

"It is obvious that there is no precise test for determining worthlessness within the taxable year and neither the statutory enactment, its regulations, nor the decisions attempt such an all-inclusive definition. From the numerous decisions, we are taught that a determination of whether or not a debt becomes worthless in a particular year must be confined to the fact of the particular case. Further-

more, it is often impossible to select a single factor or 'identifiable event' which clearly establishes the time at which a debt becomes worthless and thus deductible. More often it is a series of events which in the aggregate present a picture establishing that the debt in question has become worthless. Such a decision of necessity requires a practical approach, not a legal test. Boehm v. Commissioner, supra. It must be flexible in nature, varying according to the circumstances of each particular case, so that whatever inferences a court might draw from a particular fact in another case are not binding on the examining court, although the same fact may be present. The Tax Court has aptly said that 'worthlessness is not determined by an inflexible formula or slide rule calculation, but upon the exercise of sound business judgment.' Washington Institute of Technology, Inc., 10 T.C.M. 17, 20 [¶ 51,001 P-H Memo TC] (1951). In making such a determination the taxpayer must follow a rule of reason, avoiding alike the Scyllian role of the 'incorrigible optimist' and the Charybdian character of the 'stygian pessimist.' United States v. S. S. White Dental Mfg. Co., 274 U.S. 398, 403 [6 AFTR 6750] (1927); Ruppert v. United States, 86 Ct. Cl. 396, 403, 22 F. Supp. 428, 431 [20 AFTR 904], cert. denied 305 U.S. 630 (1938). To be deductible, a debt need not be proven worthless beyond all peradventure, since a bare hope that something might be recovered in the future constitutes no sound reason for postponing the time for taking a deduction. Montgomery v. United States, 87 Ct. Cl. 218, 228 (1938), 23 F. Supp. 130, 135 [21 AFTR 244], cert. denied 307 U.S. 632 (1939); Curry v. Commissioner, supra. The taxpayer is not required to postpone his entitlement to a deduction in the expectancy of uncertain future events nor is he called to wait until some turn of the wheel of fortune may bring the debtor into affluence.

"It appears that the taxpayer must strike a middle course between optimism and pessimism

and determine debts to be worthless in the exercise of sound business judgment based upon as complete information as is reasonably obtainable. Once it appears from all the surrounding circumstances that a debt has become worthless, we cannot look to subsequent events to determine if a debt in fact became worthless. The possibility of collection is tested by the facts known at that time and not by hindsight. However, subsequent events may be used to evaluate the soundness of our determination that a debt become worthless in a certain year. See 5 Mertens, Law of Federal Income Taxation, section 30.37 (Rev. Ed.). Thus our inquiry must be focused on each year in which the debts were in existence without the benefit of subsequent events to help us arrive at our determination."

The foregoing criteria make it necessary to set out all the pertinent facts* elicited in this suit in order to identify them, weigh them, and to make a determination. These data have been placed in chronological order to present the picture as it developed.

In February of 1966, the plaintiff purchased $19,503.49 of the capital stock of Eagle Flightways, Inc., representing one-half of the outstanding stock. At that time, Eagle had a long-term lease of specific property from the City of Hillsboro, Oregon, located within the Hillsboro Municipal Airport. The corporation owned buildings and other improvements erected on the leased property.

Eagle ran a flight school, an air taxi activity, sold fuel, provided storage facilities for privately owned aircraft, and dealt in the sale of airplanes. Plaintiff

---

* Although the construction of the statute depends upon federal interpretations, a particular duty is here imposed upon the defendant because a question of fact is involved; i.e., ORS 316.032 provides that there is no limit to the right or duty of the defendant "to audit the return of any taxpayer or to determine any fact relating to the tax liability of any taxpayer."

began as an inactive officer of the corporation but it appears that he soon became the chief executive officer, the guarantor of loans made by third parties to the corporation, and the creditor of the corporation as an individual lender, with and without security. Plaintiff's loans are found to be a series of advances over the period of 1966 and 1968, possibly in 1969. The testimony seems clear that no loans or guaranties were made after December 31, 1969.

On March 2, 1966, plaintiff gave a written guaranty to a national bank, guaranteeing Eagle's present and future advances of credit by the bank to the amount of $70,000. The guaranty contained a strong subordination clause, as follows:

"7. Subordination of Guarantor's rights against Borrower. Guarantor agrees that the indebtedness of Borrower to Bank, whether now existing or hereafter created, shall be and the same hereby is declared to be prior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent, and Guarantor shall and does expressly subordinate any such claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Bank may now or hereafter have against debtor. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Bank and Guarantor shall be paid to Bank and shall be first applied by Bank to the indebtedness of Borrower to Bank. Guarantor does hereby assign to Bank all claims which it may have or acquire against Borrower or any assignee or trustee in bankruptcy of Borrower; provided, that such assignment shall be effective only for the purpose of assuring to Bank full payment of all indebtedness of Borrower to Bank."

(In a subsequent letter of the bank to the plaintiff, dated March 26, 1971, the bank stated: "Since the credit to Eagle Flightways was granted solely upon the support of collateral furnished by you individually, which in turn supported your Guaranty, it is elementary that without that support, it would not have been possible to make the loan.") Plaintiff had deposited with the bank personally owned securities and shares of corporate stocks and, in addition, at that time, he was the holder of a mortgage given by Eagle as security for loans made directly by plaintiff to Eagle, covering the leased premises at Hillsboro and the improvements thereon owned by the corporation. Eagle's mortgage to Johnson was to secure Eagle's promissory notes to the plaintiff for the sum of $50,000 of indebtedness then overdue, and to cover all other future advances and loans of the plaintiff to Eagle and all existing or future guaranties of the plaintiff for the benefit of Eagle. The value of this mortgage was, of course, subordinated to the claims of the bank pursuant to the guaranty of March 2, 1966, as were some chattel mortgages in small amounts given to secure plaintiff respecting moneys advanced to "floor" aircraft.

On March 1, 1967, the mortgage above described was cancelled and replaced by a new mortgage from Eagle to plaintiff. The new mortgage was necessitated by the fact that the Port of Portland had taken over the interests of the City of Hillsboro in the Portland-Hillsboro airfield, and Eagle Flightways, Inc., had to accept a revised lease which the Port had offered and which the plaintiff testified, "* * * we had no choice but to accept." The new lessor took a narrower view as to the corporation's rights under the lease than had the predecessor lessor, giving rise to a dispute which adversely affected Eagle's fortunes from that point

forward and which was never resolved during the period involved in this suit.

On March 20, 1967, Eagle found it necessary to give a mortgage covering the same property in the sum of $50,000 to a savings and loan association, to be repaid on or before April 1, 1977, the mortgage being executed by the plaintiff as a vice-president of the corporation for a loan of $50,000. The plaintiff subordinated his own mortgage to this additional mortgage.

On July 7, 1967, the plaintiff personally guaranteed to Standard Oil Company of California, in consideration of its granting credit to Eagle, to pay when due all charges for the account of Eagle of whatever nature, this guaranty to remain in force until terminated in writing.

Eagle had been losing money for some years but, early in 1969, according to the undisputed testimony, Eagle's losses increased more rapidly because of the unexpected and difficult relationship with the Port of Portland, and the business started "winding down." Negotiations with the Port for clarification of its lease continued, and matters could have improved in that respect or have been made worse but, the plaintiff testified, "I was going to lose money no matter which way it happened." In the spring of 1969, the national bank put pressure on Eagle and then on the plaintiff to repay the bank's loans to Eagle but plaintiff was able to obtain some deferment. On August 25, 1969, plaintiff executed a new and additional guaranty to the bank in the sum of $100,000 which, according to plaintiff's best recollection, was an addition to and not a supersession of the earlier guaranty of $70,000. In any event, both written guaranties remained outstanding. The subordination clause mentioned above was also present in the second guaranty. In September or

October 1969, there was renewed demand by the bank to Eagle and to plaintiff to repay the advances to Eagle, which at that time amounted to $95,000 plus interest. (The account had been reduced from a balance of $227,250, as of October 31, 1968, but only $750 had been paid in 1969.)

As a result of these various transactions, the plaintiff exposed himself to potential losses from his position as a stockholder, guarantor and creditor of Eagle Flightways, Inc. The treatment of the losses plaintiff sustained as a stockholder and guarantor of Eagle Flightways, Inc., is not in dispute here.

In order for plaintiff's loan to be classified as "worthless," it must be shown that it was not secured by a valuable collateral and that there is no likelihood of a recovery at any time in the future. *Leon S. Black,* 52 TC 147 (1969). The Tax Court, in *Higginbotham-Bailey-Logan Co.,* 8 BTA 566, 578 (1927), found the general definition of worthlessness to be "[d]estitute of worth; having no value; valueless; useless." See *Minneapolis, St. Paul & Sault Ste. Marie R.R. Co., supra,* for an in-depth discussion on the determination of "worthlessness." The court is placed in the position of determining whether or not the $109,000 loan outstanding to Eagle Flightways, Inc., had attained this status as of December 31, 1969.

The testimony initially presented to this court, while seeming to indicate some grounds on which worthlessness could be found, also presented conflicting facts which were not clearly presented by either party and made impossible a satisfactory determination. On its own motion, the court called for further

evidential material and these data have given some clarification.

From the total evidence submitted, it was determined that the mortgaged property had an approximate value of $112,000 as of December 31, 1969. This was the value used by both the plaintiff and the defendant in their respective briefs and is the same value placed upon the property by the assignment and conveyance in lieu of foreclosure executed in April 1970 by Eagle Flightways, Inc. The property was subject to the savings and loan association mortgage of approximately $38,800 at that date. Thus there remained a $73,200 equity, subject to the plaintiff's mortgage and to the restrictions placed upon the equity by plaintiff's guaranty agreements with the national bank. In addition to plaintiff's security interest in the leasehold, plaintiff also, as secured party under financing statements Nos. 6855 and 6856 issued by Eagle Flightways, Inc., on June 26, 1968, held a secured interest in all the corporation's accounts receivable and proceeds thereof, all service parts and accessories, all the inventory of gas and oil, work in process, school supplies, all office and general equipment, and all shop and line service equipment. As a result of these security interests and the chattel mortgages on various aircraft held by plaintiff as of December 31, 1969, the following computations were made as to the total fair market value of plaintiff's secured interest, net of prior security interests except for that held by the national bank.

## Secured interest arising from aircraft chattel mortgages and financing statements held by plaintiff

| Airplanes: | Net secured value as of 12-31-69 |
|---|---|
| Cessna No. N51295 | $ 1,744.16 |
| Cessna No. 8065Z | 4,905.92 |
| Cessna No. N22837 | 1,248.78 |
| Piper No. 6605W | 1,770.16 |
| Total secured by chattel mortgages | $ 9,669.02 |
| Accounts receivable | 17,000.00 |
| Service, parts and equipment inventory | 2,400.00 |
| Inventory in progress | 2,142.00 |
| Gas and oil | 3,070.00 |
| School supplies | 984.00 |
| Shop and line service equipment | 1,167.00 |
| Office and general equipment | 6,000 00 |
| Total items secured in addition to leasehold property | $ 42,432.02 |
| Net security interest in leasehold premises | 73,200.00 |
| **Total secured assets | $115,632.02 |
| Less mortgage to national bank | — 95,000.00 |
| **Total net secured assets | $ 20,632.02 |

The debtor's petition for bankruptcy filed on January 29, 1971, raises questions as to the valuation

** Totals are subject to being increased by the values of certain asset accounts present on December 31, 1969, consisting of cash of $999, prepaid expenses of $5,000, and deposits and other assets of $4,972, as they may prove to have been "proceeds and products" of accounts receivable which also have been secured by the plaintiff. Additional adjustments may also be necessary as required by items alluded to in the decision immediately following the computations of secured interest.

of plaintiff's actual potential loss position as of December 31, 1969. The information sheets attached to the filing indicate that Eagle Flightways, Inc., in August 1969, transferred $30,000 of parts to another corporation set up by the plaintiff to continue the aircraft operations, and that the method of payment, *if any,* for such parts, had not been described. This item was not further explored by the referee in bankruptcy, apparently because the plaintiff has personally paid substantially all of the bankrupt's debts. While this may not have been important for the bankruptcy proceedings, in determining the value of both plaintiff's total outstanding loan to Eagle Flightways, Inc., and his security on such loan, this item is of vital importance. The additional information supplied by the plaintiff, at the court's request, does not clarify this item, but the court notes with interest that, in August 1969, the plaintiff entered into a guaranty agreement with the national bank subjecting him to a total liability of $100,000, which is exactly $30,000 more than the amount of the guaranty entered into by the plaintiff in 1966. The court need not speculate whether or not the transfer of the $30,000 of parts was in effect a repayment of part of the plaintiff's loan or resulted in an accounts receivable from the plaintiff, which would be secured under the various security agreements he held, and thus provide additional secured property for collection of a total loan. The presence of the secured property, as computed above, automatically leads to a denial of the bad debt deduction under Int Rev Code of 1954, § 166(d)(1)(B).

The debtor's petition also raised additional conflicts with the evidence previously submitted at trial, in that the plaintiff states on line 1.a. of the Statement of Affairs that the operations of Eagle Flightways, Inc., ceased on August 31, 1970, and that as of the filing date, the bankrupt corporation owed Standard Oil of California a total unsecured debt of $4,042.93, at 4½

percent interest. In Plaintiff's Exhibit 4, submitted in evidence, the plaintiff asserted that he paid, as a guarantor of the bankrupt corporation's obligations to Standard Oil Company, a total of $12,406.27 by means of a check dated April 23, 1971. This fact raises a distinct question as to the amount of debts the plaintiff personally paid as guarantor of the bankrupt corporation, or whether in fact such debts were incurred by the succeeding corporation set up by plaintiff, or, in the alternative, that additional inventories were on hand as of December 31, 1969. In each case, inconclusive information has been submitted, even after the court's request for additional information in furtherance of a definitive decision. The transfer of $30,000 of parts during 1969 without any accountability being made for payment for such parts may have resulted in substantially more secured assets being available to the plaintiff, in that his position as a guarantor must be separated from that of a creditor in determining whether or not his loan is worthless. If plaintiff merely increased his total obligation as a guarantor by $30,000, without making an actual payment for such parts transferred, then, in reality, the December 31, 1969, secured value would have to be increased by $30,000. In that case, the plaintiff through his security interest in such inventory, on December 31, 1969, would hold a legally enforceable security interest against the party receiving such inventory, as any other result would defraud the plaintiff-creditor.

Plaintiff asserts that the court should take into consideration the fact that he had additional obligations as a guarantor which exceeded the residual value of the secured assets. In a determination as to the worthlessness of a debt, the court cannot reduce the amount of assets available for repayment of the loan by the amount of anticipated obligations voluntarily assumed by the claimant as a guarantor of obligations of Eagle Flightways, Inc. Just as the corporation is

treated as an entity, separate and apart from plaintiff, making possible the potential write-off of debts which would otherwise be nondeductible personal liabilities, so, too, the court must view the plaintiff's position solely as a creditor of the corporation for purposes of determining whether or not the debt in question is worthless. The court need not explore the complex situation arising where no secured assets are available to the creditor, and in which a distinct possibility exists that the guarantor, as joint obligor, would be called upon to pay off the secured third parties, thus raising a question as to the guarantor's priority rights as against those of the secured creditor. Plaintiff's deduction of a bad debt would occur only through his status as a creditor and, therefore, any payment necessitated as a guarantor of additional obligations of the debtor is not determinative of whether or not the debt is worthless but must be dealt with in later years if and when the plaintiff makes unreimbursed payments as guarantor.

 In view of the priority of plaintiff's claim as creditor, which is borne out by the ultimate assignment to him of the leasehold interest and additional assets of the corporation, and the presence of at least $20,632 in secured assets as of December 31, 1969, the plaintiff has not proven that the "last vestige of value has disappeared" from his debt as required by law before it can be classified as "worthless." *Bodzy v. Commissioner*, 321 F2d 331 (5th Cir 1963), 63-2 USTC ¶ 9599, 12 AFTR2d 5166.

Defendant's Order No. I-73-51, dated September 12, 1973, is affirmed on the ground that the plaintiff has not met his burden of proving, by a preponderance of the evidence, that the $109,000 debt claimed as an income tax deduction was wholly worthless as of December 31, 1969.