DECISION
Plaintiffs appeal concerning personal income tax matters for the three tax years 2002, 2003, and 2004.
Prior to trial, the parties agreed to certain items.[1] First, Defendant will reverse the 2002 and 2003 Schedule C adjustments. Second, no additional expenses above those originally reported will be allowed. Third, for 2004, the amount of Plaintiffs' loans to the family corporation were in the amount of $91,762.
The sole issue argued at trial was whether those loans should be characterized as business or non-business bad debt for the 2004 tax year.
A trial was held in this matter. Dean Allen, Certified Public Accountant, represented Plaintiffs. Roger and Barbara Ingram testified as witnesses. Bruce McDonald, Auditor, appeared for Defendant. The record closed October 10, 2007.
 I. STATEMENT OF FACTS
On November 14, 2002, a corporation was formed, C Rogers Associates, Inc. Operations ceased in March of 2004. It was later dissolved on April 29, 2004. In the interim, it *Page 2 
was in the business of selling certain jewelry, specifically toe rings. Plaintiffs held 49 percent of the outstanding shares and were officers who performed services for the company. Their son, Chris, held the majority portion at 51 percent. During the 17 months of operations, Plaintiffs advanced funds to the firm. No loan documents were written or signed, although the shareholders agreed the loans would be repaid; they were not. The obligations were reflected in some of the official corporation books and in minutes kept of the firm's meetings. Plaintiffs claim total loans of $167,189; the parties have quantified the bad debt portion at $91,762.
Plaintiffs claim the loans were made "to protect [their] jobs."[2]
Their ultimate goal was to receive substantial salaries. Ms. Ingram testified she expected to be paid a salary within eight months after formation of the business and later to share in long-term profits. Plaintiffs stated they intended the venture to support their retirement plans. Ms. Ingram testified the loan was "certainly not an investment" nor was it a gift. She believed the money would be repaid with interest, although a certain rate was never specified.
Prior to formation of the business, the three family members discussed various structures such as a partnership and C corporation. They settled on the second model, expecting rapid growth. At the outset, loans were not anticipated as Chris had six months of funding on hand. The business began as an internet sales operation. It later expanded to retail store fronts and mall kiosks. Plaintiffs were both actively involved in the firm's operations.
As the business began to lose more money, various avenues were explored to improve profits. Those included plans to expand the inventory, employee commission plans, researching *Page 3 
mainland suppliers to lower costs, a website, online auction sales, and seeking rent reductions. None were successful.
In early 2004, Plaintiffs met with Chris in Las Vegas. The company had excessive debt and was not profitable. The corporation was then dissolved. Many debts remained.
Chris Ingram died June 8, 2004. Prior to his death, he had a serious drug addiction. That, in large part, led to the demise of the business. Mr. Ingram testified about Chris's erratic behavior. Chris did not consult with the other shareholders. He undertook expansion details and assumed debt without rational reasons. He signed leases and then asked for more funds. Mr. Ingram stated the behavior "ruined us." Plaintiffs testified they were unaware of the drug problems until 2004.
Plaintiffs contrasted their lives before and after this business venture. Prior to 2002, they described themselves as stable and practical with a home in Salem. They owned rental property and two cars. After the dissolution of the corporation, their home was sold and the rental property was lost. They filed bankruptcy in 2004. Their retirement funds were spent on the firm's unpaid liabilities.
 II. ANALYSIS
The key issue presented is whether the loans made to the corporation should be characterized as business or non-business bad debt. In order to determine if a debt meets the definition of a bad debt, the court looks to section 166 of the Internal Revenue Code (IRC). See Johnson v.Dept. of Rev., 6 OTR 21 (1975).
Defendant claims that the monies advanced were not bona fide loans. A bona fide loan arises from a debtor-creditor relationship based upon a valid and enforceable obligation to pay a *Page 4 
fixed or determinable sum of money. Goldstein v. Comm'r, 40 TCM (CCH) 752, TC Memo 1980-273, WL 4118 (1980). That case involved an examination of a loan meeting the definition of a bona fide debt. In that analysis, nine common factors were listed. They are listed below and compared with the facts in this appeal. Id.
1. Whether a note or other evidence of indebtedness exists.
The parties did not execute any loan documents or promissory notes.
2. Whether interest is charged.
No provisions were made for the imposition of interest.
3. Whether there is a fixed schedule for repayments.
Terms for repayment were not specified.
4. Whether any security or collateral is requested.
No security or collateral was mentioned by the parties.
5. Whether there is any written loan agreement.
The loan terms were not reduced to writing. Plaintiffs stated that was because the loans were between family members and all could be trusted.
6. Whether a demand for repayment has been made.
No evidence was presented to show any request was made or even contemplated.
7. Whether the parties' records, if any, reflect the transaction as aloan.
Plaintiffs submitted portions of balance sheets which show certain long term liabilities for 2004. There were some inconsistencies as to amounts and dates, especially in comparison to the corporate tax returns. *Page 5 
8. Whether any repayments have been made.
Defendant concedes that a single repayment of inventory was made of approximately $27,000.
9. Whether the borrower was solvent at the time of the loan.
The corporation never made a profit. Plaintiffs' representative stated that "in 2004, after suffering recurring losses, the Corporation was insolvent."[3]
On balance, an evaluation of these important factors leads to the conclusion that those loans were not bona fide business loans. A prudent business person, knowing the condition of the company, would not have reasonably advanced these funds.
Finally, Plaintiffs advanced the argument that the loans were made to protect their future employment. When shareholder-employees, in order to protect their individual investment, guarantee their corporation's loan, they are acting with non-business motives. Conversely, if they guarantee their corporation's loan to protect their employment, they are acting with business motives. Brooks v. Comm'r, 59 TCM (CCH) 682, TC Memo 1990-259, WL 64252 (1990). Plaintiffs bear the burden of proof to show their dominant motivation. Id.; Gunnari v. Dept. of Rev., 15 OTR 225,228 (2000).
To determine the dominant business or non-business motive of a shareholder lending money to a corporation where he is also an employee, courts look primarily to three objective factors: the size of the taxpayer's investment, the size of his after-tax salary and the other sources of gross income available to the taxpayer at the time of the loan. Hutchinson v. Comm'r, TC Memo 1982-45. The larger the taxpayer's investment, the smaller his salary, and the larger *Page 6 
his other sources of gross income, the more likely are the courts to find a dominant nonbusiness motive for the loan.
In this case, importantly, Plaintiffs had never received any salaries, nor were they promised any, during the 17 months of operations. The most important inquiry is whether the dominate motive for making a loan was the retention of salary. United States v. Generes, 405 U.S. 93 (1972). There, the taxpayers had been receiving regular, substantial wages from the company for several years. The shareholders here were in a different posture. Courts review loan transactions between family members with heightened scrutiny. Flood v. Comm'r, 81 TCM (CCH) 1175, TC Memo 2001-39.
After review, the evidence reflects that a reasonable person would view the loans as attempts to preserve and protect the initial, sizable investments. At that stage in the business's life, it was doubtful that profits would be realized, or that wages (of any size) would ever be paid to Plaintiffs. It is difficult to view the loans as protecting something that has never happened and will not reasonably occur.
In these appeals, a preponderance of the evidence is required to sustain the burden of proof. That burden of proof shall fall upon the party seeking affirmative relief. ORS 305.427.[4] Plaintiffs have not met that statutory requirement in this record.
 III. CONCLUSION
After a careful review of the evidence and arguments, the court finds that Plaintiffs are not entitled to a deduction under IRC section 166
because the loans were not a bona fide debt. As to the other agreements between the parties, listed at the outset of this Decision, the court concurs. Now, therefore, *Page 7 
IT IS THE DECISION OF THIS COURT that Defendant shall make the changes as recommended above; and
IT IS FURTHER DECIDED that Plaintiffs are denied their claim for a 2004 bad debt deduction.
Dated this ____ day of March 2008.
If you want to appeal this Decision, file a Complaint in the RegularDivision of the Oregon Tax Court, by mailing to: 1163 State Street,Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 StateStreet, Salem, OR.
 Your Complaint must be submitted within 60 days after the date of theDecision or this Decision becomes final and cannot be changed.
 This document was signed by Magistrate Jeffrey S. Mattson on March 5,2008. The Court filed and entered this document on March 5, 2008.
[1] Defendant's letter filed February 8, 2007.
[2] November 14, 2005, letter to Defendant's auditor.
[3] Plaintiffs' letter dated January 22, 2006.
[4] All references to the Oregon Revised Statutes (ORS) are to 2005. *Page 1